**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

Edvin Sandoval and Hugo Sandoval,

              Plaintiffs,

vs.

Dustar Express, Inc., and Shawn Munns,

              Defendants.

Case No. 24-CV-02601 (SRN/SGE)

**REPORT &**
**RECCOMENDATION AND**
**ORDER**

_____

This matter comes before the Court on Plaintiffs' Motion for Sanctions for Spoliation of Evidence. (Dkt. 42.) Following briefing, the Court held oral argument on December 4, 2025. (Dkt. 56.) For the reasons set forth below, the Court recommends granting Plaintiff's request for an adverse inference instruction pursuant to Federal Rule of Civil Procedure 37(e)(2), and separately, the Court grants in part and denies in part Plaintiff's request for sanctions under Rule 37(e)(1).

**BACKGROUND**

On September 16, 2022, a vehicle collision occurred between Plaintiffs and Shawn Munns at the intersection of Minnesota Trunk Highway 60 and County Highway 1. (Dkt. 45-1 at 5.) At the time of the collision, Shawn Munns was employed by Dustar Express, Inc. ("Dustar") as a commercial truck driver (Dkt. 51 ¶ 2) and the tractor-trailer driven by Munns and involved in the collision was owned by Dustar. (*Id.* ¶ 3.) Immediately following

the collision, law enforcement had the tractor-trailer ("Truck 709")[1] towed and placed under a law enforcement hold. (Dkt. 51 ¶ 4; Dkt. 51-1 at 1.)

Less than a week after the crash, Plaintiffs' counsel sent preservation letters to Dustar, Munns, and Dustar's insurer, Secura Insurance, on September 21 and 22, 2022. (Dkt. 45 ¶ 5; 45-4 at 1-11 (Dustar Letter); *id.* at 14-24 (Munns Letter); *id.* at 25-35 (Secura Letter).). The letters specifically demanded that evidence "be maintained and preserved, and not be destroyed, modified, altered, repaired or changed in any manner, and further that you immediately put any third-party vendor that has or controls this information, material, or documentation, on notice to maintain and preserve." (Dkt 45-4 at 2.)[2]  The preservation letters also specifically identified the following evidence, to be preserved:

> The GPS location data for six months prior to the wreck for Mr. Munns.
> . . . .
> All OmniTRAC, Qualcomm, MVPC, QTRACS, OmniExpress, TruckMail, TrailerTRACs, SensorTRACS, JTRACS, and other similar systems data for the six (6) months prior to the collision and the day of the collision, for Mr. Munns, the subject truck, and the subject trailer.
> . . . .
> The front and back of Mr. Munns' daily logs and his co-driver's logs (if any) for the day of the collision, and the six-month period preceding the collision, together with all material required by 49 C.F.R. 395.8 and 395.15 for the driver(s) involved in the above matter together with the results of any computer program used to check logs as well as all results of any audit of the logs by your company or a third party. This specifically includes any electronic on-board computers (AOBRD's, EOBR's, etc. . . .) and the audit trial for those entries. We require you to put any vendor which stores or audits this information on notice of the need to preserve this data.
> . . . .

---

[1] Dustar refers to the truck driven by Shawm Munns as "Truck 709." (*See* Dkt. 50 ¶ 2; Dkt. 48 at 3.)

[2] The letters are verbatim the same, except for the addressee, thus the Court cites only Plaintiffs' letter to Dustar. (Dkt. 45-5.)

Any computer data from the tractor or trailer to include but not be limited to: any data and printout from on-board recording devices, including but not limited to the ECM (electronic control module), any on-board computer, tachograph, trip monitor, trip record, trip master, Hours of Service (HOS) or other recording or tracking device for the day of the collision and the six (6) month period preceding the collision for the equipment involved in the collision.

(Dkt. 45-4 at 3-4.) Shortly after the preservation letters were mailed, Dustar retained Attorney Mark Brown, an experienced trucking accident lawyer. (Dkt. 45 ¶ 15; Dkt. 45-5 at 99:1–99:13;[3] Dkt. 45-14; Dkt. 45-15.) Once Dustar received the preservation letter, it simply forwarded the letter to its insurance provider, Secura. (Dkt. 45-5 at 97:25-98:21; Dkt. 51 ¶ 11.) Although Secura received this letter directly from Plaintiffs and from Dustar, Secura seemingly made no response to this letter. (Dkt. 45-5 at 98:19-25.)

On October 27, 2022, a little over a month after the crash, Plaintiffs' counsel emailed Mr. Brown specifically asking whether Truck 709 had "any cameras, electronic logs, or aftermarket additions" that Plaintiffs needed to be aware of in preparation for a joint inspection of Truck 709. (Dkt. 55-1.) Mr. Brown did not respond to that question, and the joint inspection of Truck 709 took place on October 28, 2022 at the tow yard. (*Id.*) Months later, on March 31, 2023, Truck 709 was released from the law enforcement hold, and Dustar regained unfettered physical access. (Dkt. 51 ¶ 6; Dkt. 51-1 at 1.)

Plaintiffs eventually filed suit against Shawn Munns for negligence in operating the truck and Dustar for vicarious liability and direct negligence, including negligent hiring,

---

[3] Where the Court cites to deposition testimony, it cites to the page number in black font located in the upper right-hand corner. Where the Court cites to documents filed on CM/ECF it cites to the CM/ECF page number located in blue font at the top of the page, unless otherwise noted.

retention, and supervision. (*See* Dkt. 1.) During the first round of discovery Plaintiffs learned from Dustar on February 25, 2025, that Truck 709 did in fact have a device installed to collect telematics data. (Dkt. 45-7 at 6-7.)[4] Specifically, Dustar answered that "Verizon Connect was used to help drivers locate their delivery and for miles to be sent to the individual who handles the miles report." (*Id.* at 7.) Dustar later supplemented its discovery response on May 28, 2025. (Dkt. 45-8.) In this supplement, Dustar asserted that the "onboard Verizon Connect system was destroyed in an accident that occurred on May 9, 2023." (*Id.* at 3, 6-8.)

Following Dustar's disclosure, Plaintiffs deposed Dustar co-owner Patti Koopmans on July 21, 2025. (Dkt. 45-5.) Ms. Koopmans testified that Truck 709 had a Verizon Connect device installed at the time of the collision and Dustar used the device to track miles, record speed, and to comply with licensing and permitting requirements. (*Id.* at 83:3-85:19; 87:12-88:16; 92:12-25.) Ms. Koopmans explained that she could access the Verizon Connect data by logging into Dustar's Verizon Connect account on a computer. (*Id.* at 87:12-17.) Ms. Koopmans also testified that she remembered receiving the preservation letter from Plaintiffs and acknowledged that she took no steps to preserve any Verizon Connect data. (Dkt. 45-5 at 98:12-18.) Based on Ms. Koopmans' testimony, on July 23, 2025, Plaintiffs served additional discovery requests to clarify the circumstances surrounding the Verizon Connect data and obtain additional information. (Dkt. 44 at 6, 45-

---

[4] At the hearing on this Motion, Plaintiffs' counsel confirmed the first time they heard of any device installed on Truck 709 was from Dustar's interrogatory answers in February 2025.

9.) When Dustar did not respond to Plaintiffs' second set of discovery requests (Dkt. 44 at 6), Plaintiffs submitted a third set of interrogatories and request for production of documents on August 4, 2025. (Dkt. 45-9.)

Dustar responded to Plaintiffs third set of discovery requests on October 7, 2025. (Dkt. 45-10.) Dustar contended that the details of the relevant Verizon Connect device installed on Truck 709 were unknown. (*Id.*) For the first time, Dustar asserted that the "Verizon Connect device was replaced and activated on or about April 12, 2023, by Dustar Express employees as the original device was not operable." (*Id.* at 3, 5.) Dustar also explained that the "Verizon Connect device was inoperable at the time the truck was returned to Defendant after the subject incident. It was the understanding of Dustar [] that no content could be downloaded or retrieved, and therefore it was not preserved." (*Id.* at 5.)

Following Dustar's response to discovery, Plaintiffs deposed Verizon's corporate representative on October 20, 2025. (Dkt. 45-6.) The representative explained that the Verizon Connect device, or vehicle tracking unit ("VTU"), is a palm-sized device mounted under the dashboard of a truck and connected to the truck's onboard diagnostic port. (*Id.* at 29:24-30:5; 33:3-18.)[5] He testified that every thirty to one-hundred and twenty seconds, a VTU attached to a truck records GPS data and harsh driving incidents such as hard breaking or rapid acceleration. (*Id.* at 34:2-25; 49:11-25.) The VTU then transmits that data to the Verizon Connect servers, which is stored in two places: the client-facing platform,

---

[5] The Verizon representative testified to the VTU connected to a OBD2, which he later explained is an acronym for "Onboard Diagnostic, Version 2." (Dkt. 45-6 at 39:15-22.)

Verizon Reveal; and Verizon Connect's long-term, internal electronic archives. (*Id.* at 17:21–18:23.) The representative further explained that the Verizon Reveal platform retains this telematics data for twelve months and Verizon Connect's long-term archive retains the data for up to five years. (*Id.*) Clients can access data from any VTU on the Verizon Reveal platform online. (*Id.* at 17:21-18:23; 57:23-58:4.)

The representative explained that Verizon attempted to recover the VTU data by searching its archive using Truck 709's VIN number and the driver's name (Shawn Munns), however, nothing relevant was found. (Dkt. 45-6 at 25:23-28:1; 75:21-76:6.) In addition to using Truck 709's VIN and the driver's name, Verizon also reviewed 700 pages of customer communications with Dustar—the entire correspondence file for 2022. (Dkt. 45-6 at 10:22-12:7.) There was no mention of the collision on September 16, 2022 or of any auto accident in 2022 within the correspondence. (*Id.* at 11:10-23.) And there was never a request from Dustar to preserve or download the VTU data. (*Id.* at 11:10-23; 65:7-19.) The representative explained that Verizon's searches likely yielded no September 16, 2022 crash data because the VTU was self-installed by Dustar, instead of a professional installer, and Dustar had not associated Truck 709's VIN number, nor Shawn Munns' name with the specific VTU in its Verizon account. (*Id.* at 26:2-27:7, 62:14-63:4; Dkt. 45-13.) The representative stated that Verizon could still search for data recorded by the VTU installed at the time of the accident if they had the VTU's serial number. (*Id.* at 29:2-11.) In other words, the VTU's serial number would reveal the data the VTU recorded regardless of its destruction or whether Dustar linked it to Truck 709's VIN number or Shawn Munns' name. (*Id.*)

On November 11, 2025, less than a month after Plaintiffs' deposition of the Verizon representative, Plaintiffs brought this Motion for Sanctions. (Dkt. 25.) In response, Dustar submitted affidavits of a co-owner Patti Koopman and the Office Administrator in charge of managing Verizon Reveal for Dustar, Kimberly Rens. (Dkts. 50, 51.) According to Ms. Rens, Dustar used the Verizon service to collect and compile monthly trucking data, specifically tracking the location and milage of Dustar's fleet to generate required regulatory and tax reports. (Dkt. 50 ¶¶ 1-3, 5.) These monthly reports include the truck's daily start and stop time, start and stop location, total trip drive time, and idle time. (Dkt. 50-1.) Ms. Rens also explained she reviewed Verizon reports for Truck 709 to respond to discovery requested in this lawsuit. (Dkt. 50 ¶ 7.) According to her, the VTU in question stopped recording data for Truck 709 beginning on the day of the accident, September 16, 2022. (*Id.* ¶ 8-9.)[6] She states that she contacted Verizon about the lack of data, and Verizon informed her that it did not know why the "the system stopped recording or showing data for Truck 709." (*Id.* ¶ 9.) She then ordered a replacement VTU from Verizon and had it installed on April 12, 2023. (*Id.* ¶ 13; Dkt. 50-1 at 51-53.) In an effort to respond to this Motion, Ms. Rens contacted Verizon again and received an email on November 18, 2025, explaining that Truck 709 was no longer part of Dustar's fleet on its Verizon account, and thus it could not pull reports for her. (Dkt. 50-1 at 54.)

---

[6] The Court notes that in its brief Dustar contends that the VTU in Truck 709 stopped recording data on September 15, 2022 (Dkt. 48 at 6), while Ms. Rens affidavit states data stopped recording on September 16, 2022 (Dkt. 50 ¶ 8-9).

In contrast to Ms. Ren's account, Ms. Koopman's affidavit claims, "Dustar did not remove or disable the Verizon device on the subject truck while the vehicle was in our possession, and I am not aware of any action by Dustar that caused any Verizon data to be lost." (Dkt. 51 ¶ 13.)

Following additional briefing and a hearing on December 4, 2025, the Court permitted Dustar an additional twenty-six days to "locate the VTU or the serial number of the VTU" involved in the collision and ordered Dustar to submit a letter to the Court addressing:

> (1) whether Dustar has located the VTU, (2) if the VTU has not been located, the efforts Dustar took to locate it, (3) whether the VTU's serial number has been recovered through other means, and (4) if the VTU's serial number has not been recovered, what steps Dustar took to discover the serial number.

(Dkt. 56.) The Court informed the parties that it would take the motion under advisement after Defendants submitted the letter (*Id*.) Dustar timely filed its letter on December 31, 2025, informing the Court that Dustar had not located the VTU or the VTU's serial number, and the steps it took to obtain both. (Dkt. 57.) The Cout took the matter under advisement on December 31, 2025. (Dkt. 56.)

## ANALYSIS

Plaintiffs move for sanctions under Federal Rule of Civil Procedure 37(e)(2), alleging Defendants failed to preserve and intentionally allowed the destruction of the electronically stored information ("ESI") from the Verizon Connect telematics system (the VTU) installed on the tractor-trailer involved in the September 16, 2022 accident. (Dkt. 42.) They also request curative measures to remedy the prejudice of the missing evidence

under Federal Rule of Civil Procedure 37(e)(1). (*Id.*) Dustar opposes imposition of any

sanction. (Dkt. 44.) [7]

## I.    Rule 37(e) of the Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 37(e) applies to the spoliation[8] of ESI. Rule 37 (e)

provides:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>     (A) presume that the lost information was unfavorable to the party;
>     (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>     (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).

---

[7] Dustar's counsel chose not to respond to Plaintiffs' request for a mandatory inference instruction as opposed to a permissive inference instruction, and instead focused argument on no instruction at all being warranted. (Dkt. 48.) Months after briefing completed and over a month after the hearing on the Motion, Dustar's counsel sought guidance from the Court on whether additional briefing was needed to determine if any instruction should be mandatory or permissive. (Dkt. 58). The Court declined to allow additional briefing at such a late stage. (Dkt. 59.)

[8] "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property of another's use as evidence in pending or reasonably foreseeable litigation." *Peterson v. Washington Cnty.*, No. 18-CV-2640 (DWF/ECW), 2021 WL 2686119, at *3 (D. Minn. June 30, 2021) (quoting *Nicollet Cattle Co., Inc. v. United Food Grp., LLC*, No. 08-CV-5899, 2010 WL 3546784, at *4 (D. Minn. Sept. 7, 2010)).

Rule 37(e) has two initial requirements for spoliation sanctions: (1) there was a duty to preserve ESI, and no reasonable steps to preserve were taken, and (2) the ESI cannot be "restored or replaced." If there was a duty to preserve, and the ESI cannot be restored or replaced, the Court may order sanctions in two circumstances under Rule 37(e). *See Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 232 (D. Minn. 2019) ("Rule 37(e) makes two types of sanctions available to the Court."). First, if the adverse party suffered prejudice from the spoliation of ESI, the Court may order sanctions "no greater than necessary" to cure the prejudice. Fed. R. Civ. P. 37(e)(1). Second, under Rule 37(e)(2), the Court can impose more severe sanctions, such as an adverse jury instruction, where the Court finds a party "acted with the intent to deprive."

Notably, prejudice is required only for sanctions under Rule 37(e)(1). Prejudice is not required for sanctions under Rule 37(e)(2) "because the finding of intent required by the subdivision can support not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." *N. Am. Sci. Assocs., LLC v. Conforti,* No. 24-CV-287 (JWB/ECW), 2024 WL 4903753, at *15 (D. Minn. Nov. 27, 2024) (quoting Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 amendment). "The moving party bears the burden of proving spoliation." *Evenson v. Johnson Bros. Liquor Co.*, No. 18-CV-3188 (JRT/LIB), 2020 WL 12948541, at *5 (D. Minn. Nov. 12, 2020) (quoting *Stepnes v. Ritschel*, No. 08-CV-5296 (ADM/JJK), 2009 WL 10711698, at *2 (D. Minn. Oct. 1, 2009)).

### A. The Duty to Preserve

"A party is obligated to preserve evidence once the party knows or should know that the evidence is relevant to future or current litigation." *Paisley Park*, 330 F.R.D. at 232 (citing *E\*Trade Sec. LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 588 (D. Minn. 2005)). "The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence." *Paisley Park*, 330 F.R.D. at 232 (quoting *Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740 (N.D. Ala. 2017)). There are "[a] variety of events [that] may alert a party to the prospect of litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Although Rule 37(e) "does not require that the requesting party issue a document preservation letter," *Paisley Park*, 330 F.R.D. at 234, courts have found preservation letters explicitly sufficient to alert a party of impending litigation which triggers the duty to preserve. *See Cooley v. Target Corp.,* No. 20-CV-2152 (DWF/DTS), 2022 WL 3647859, at \* 3 (D. Minn. Aug. 24, 2022) (rejecting argument that letter lacked merit and finding that "litigation was reasonably foreseeable" when letter was received and duty to preserve was triggered); *see e.g. Jones v. Hirschbach Motor Lines, Inc.*, No. 1:21-CV-01004 (MAM), 2022 WL 4354856, at \* 2 (D.S.D. Sept. 20, 2022) (finding a duty to preserve was "most certainly [triggered] when the company's counsel received" the preservation letter); *Blazer v. Gall,* No. 1:16-CV-01046-KES, 2019 WL 3494785, at \* 4 (D.S.D. Aug. 1, 2019*)* (finding a duty to preserve when opposing counsel "emailed an explicit request" to preserve evidence and rejecting party's argument that email "was not worded harshly enough to trigger a duty to preserve").

Here, Plaintiffs sent Dustar, Munns, and Secura a preservation letter on September 21, 2022. (Dkt 45-5.) It explicitly mentions preserving specific evidence and the legal relief Plaintiffs would seek if the evidence were not preserved. (Dkt. 45-4 at 1-2.)

Dustar claims the "extraordinarily broad" scope of the letter renders it an unreasonable preservation request, and implies therefore, the letter did not trigger a duty to preserve. (Dkt. 48 at 9.) This is incorrect. Not only is Dustar's argument lacking relevant legal authority, but it also misconstrues the legal standard. While Dustar's perspective is relevant in so far as the duty to preserve "must be viewed from the perspective of the party with control of the evidence," *Paisley Park*, 330 F.R.D. at 232, it is not the letter's scope that determines which evidence should be preserved. Instead, the "burden rests with the preserving party" to preserve ESI that is relevant "to future or current litigation." *Paisley Park*, 330 F.R.D. at 232, 234; *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment (explaining rule requires preservation of evidence when litigation is reasonably foreseeable). Dustar received a letter explicitly requesting telematics data relevant to the collision be preserved and Dustar had a duty to preserve the telematics data identified in that letter on September 21, 2022, when it was received. *Cooley,* 2022 WL 3647859, at * 3; *Blazer*, 2019 WL 3494785, at * 4; *Jones*, 2022 WL 4354856, at * 2.

### B.  Reasonable Steps to Preserve

"To fulfill the obligation to preserve evidence a litigant must take affirmative steps to prevent inadvertent spoliation." *Evenson*, 2020 WL 12948541, at *6 (cleaned up); *see also Paisley Park*, 330 F.R.D. at 233 (finding duty to preserve "required [party] to take reasonable steps to preserve"). "To be clear, Rule 37(e) 'recognizes that reasonable steps

to preserve suffice; it does not call for perfection.'" *N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, at *17 (quoting Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment). Courts evaluating a party's reasonable steps to preserve should consider factors such as the party's resources, sophistication, control over the ESI, and retention policies or systems. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. However, when the duty to preserve attaches, "a party cannot 'blindly destroy documents and expect to be shielded by a seemingly innocuous []retention policy.'" *Kelley as Tr. of BMO Litig. Tr. v. BMO Harris Bank N.A.*, 657 B.R. 475, 487 (D. Minn. 2022) (quoting *E\*Trade Sec. LLC*, 230 F.R.D. at 589).

### 1. Dustar Failed to Take Reasonable Steps to preserve data on Dustar's Verizon Reveal Platform

Dustar admits that it took no steps to preserve the VTU data nor the VTU itself after receiving Plaintiffs preservation letter. (Dkt. 45-5 at 98:12-25.) Dustar offers several explanations as to why it believes it could not take reasonable steps to preserve the VTU data. First, Dustar argues that because Truck 709 was under a law enforcement hold for seven months, it could not access the VTU data to preserve it. Second, Dustar argues the VTU in Truck 709 inexplicably stopped working on the date of the accident, so there was allegedly no VTU data to preserve, and if the VTU data did exist its loss must have "originated within Verizon's systems." (Dkt. 48 at 11, 13.) Lastly, Dustar argues that it lacked the ability or knowledge to preserve the Verizon data and thus acted reasonably in relying on Secura and retained counsel "to address any preservation obligations." (*Id.* at 14-15.) For the reasons that follow, the Court finds Dustar's arguments unpersuasive.

First, the Court will address Dustar's argument that it could not preserve the evidence because it lacked physical access to Truck 709 following the collision. According to the Verizon representative, the VTU data is transmitted from the tractor-trailer on which it is installed to the Verizon Reveal platform on the data retention cloud and can be accessed by the customer online, through their account. (Dkt. 45-6 at 17:21-18:5.) This information is supported by Dustar's co-owner, Ms. Koopmans, who acknowledged that she accessed the Verizon Reveal platform on her computer, (Dkt. 45-5 at 87:12-17) and by the Dustar Office Administrator, Ms. Rens, who described accessing the VTU data in Verizon Reveal to create reports. (Dkt. 50 ¶ 5.) Thus, having actual physical access to Truck 709 is not relevant to whether Dustar could take reasonable steps to preserve the VTU data.[9]

Second, Dustar claims that sanctions for failing to preserve evidence are unwarranted because the VTU data sought does not exist. Dustar claims the VTU stopped functioning on September 16, 2022, the day of the accident, and nothing related to the accident was recorded. (Dkt. 50 ¶ 8-9.) This claim, however, is not supported by the record. The Court notes that the timeline of Ms. Rens investigation appears to follow separate tracks: one for the VTU itself and one for the VTU data. Ms. Rens states that on or about April 12, 2023, the VTU in Truck 709 was replaced after she discovered that the Verizon virtual map[10] was showing the incorrect location for Truck 709. (*Id.* ¶¶ 10-13.) Ms. Rens

---

[9] As discussed more below, physical access to Truck 709 did matter for obtaining the VTU device.

[10] Attached as Exhibit B to Ms. Rens's declaration is an illegible screenshot of a map that was purportedly taken on November 18, 2025. (Dkt. 50 ¶ 10; Dkt. 50-1 at 50.)

explains that she "contacted Verizon" and "Verizon pinged the tracker and received no response, indicating the [VTU] was 'dead.'" (*Id.* ¶ 11.) However, Ms. Rens apparently did not review the Verizon Reveal platform data for Truck 709 until Dustar needed to respond to discovery, despite using this information "each month" for her regulatory reports. (*Id.* ¶¶ 3, 5, 7.) It was at this point she "observed that there was no data recorded for Truck 709 starting on the day of the accident." (*Id.* ¶ 8.) And only in response to this motion, on November 18, 2025, did Dustar even attempt to contact Verizon to obtain historical data. (Dkt. 50-1 at 54.) Put simply, Dustar did not attempt to access nor preserve the VTU data for Truck 709 until a little over two years after receiving Plaintiff's preservation letter, and long after the expiration of Verizon Reveal's one-year retention policy.

What Ms. Rens's affidavit and exhibits do *not* tell the Court is that no VTU data exists. The email Dustar provided from Verizon states only that Truck 709 is not part of the Verizon account, it does not state that the VTU that was installed in Truck 709 stopped generating data. (Dkt. 50-1 at 54.) Moreover, this email is misleading because the Verizon representative testified that Dustar self-installed the VTU and did not update their Verizon account to reflect that the VTU was connected to Truck 709. (Dkt. 45-6 at 26:2-14; 62:14-63:4; Dkt. 45-13.) But April 12, 2023, emails from Verizon show only that there was a new equipment order from Dustar without any indication that the equipment had stopped working. (Dkt. 50-1 at 51-53.)

Dustar's argument that any VTU data lost must have been Verizon's fault is contradicted by the Verizon representative's testimony that the data could be recovered using the VTU's serial number. (Dkt. 48 at 13-14; 45-6 at 29:2-18.) In other words, it is

15

not Verizon's retention at issue, but Dustar's failure to preserve evidence for a lawsuit after having received a preservation letter.

Dustar has given different explanations as to the VTU's whereabouts throughout this litigation.[11] The Court gave Dustar several weeks after the December 4, 2025 hearing to look for or obtain the VTU or the VTU's serial number through other means, given the importance of the serial number to retrieve the lost information. Dustar failed to preserve the VTU, failed to preserve the VTU's serial number, and allowed all VTU data on its Verizon Reveal platform relating to Truck 709 to be destroyed.

Finally, Dustar argues it reasonably relied on its insurance provider, Secura, and retained counsel "to address any preservation obligations." (Dkt. 48 at 14.)  This argument also misunderstands the law. Merely sending a preservation letter to an insurance provider and counsel "to address any preservation issues" does not relieve Dustar from its duty to take reasonable steps to preserve evidence. (Dkt. 48 at 15.) Rather, parties "are responsible for the conduct of their attorneys; an adverse party is not required to bear the burden of misconduct committed by the opposing side's counsel." *Paisley Park*, 330 F.R.D. at 233 (collecting cases). In *Paisley Park*, the Court rejected a party's argument that they could not have been expected to know to preserve relevant text messages in part because their counsel did not tell them to preserve them. *Id*. at 233. Here, it similarly does not matter that Dustar's counsel did not inform Dustar to preserve the VTU data or the VTU itself.

---

[11] The Court discusses Dustar's shifting VTU explanations more below.

Moreover, even taking into consideration that Dustar, as a small rural trucking company, has less sophistication than a large corporation, Dustar's claim that it lacked the technical ability or knowledge to preserve the Verizon data lacks credibility. Dustar used the data from Verizon Reveal to create monthly reports to meet regulatory requirements, and Ms. Koopman, a co-owner, was aware that it collected telematics data. The Court also finds Dustar's claim that it could not recognize the importance of the VTU data and VTU itself until Plaintiff's filed this lawsuit incredulous. Telematics data and information about the trailer-truck and driver is obviously relevant information to a collision. (Dkt. 48 at 19.)

The record before the Court establishes that Dustar could have easily accessed its Verizon Reveal's platform and downloaded the data any time after receiving the preservation letter and before the twelve-month retention period ended in September 2023. Dustar also could have utilized Verizon Reveal's customer support for assistance as it did when Dustar had the VTU replaced in April of 2023, and in response to this motion in November of 2025. (Dkt. 50 at 2; Dkt. 50-1 at 51-54.) And perhaps more troubling is that Dustar removed the VTU, before the twelve-month Verizon Reveal retention expiration date, and disposed of it without noting the serial number. Dustar had multiple opportunities to access the requested information and preserve it but failed to do so, without offering a valid explanation.

Dustar admits that it took *no steps* to preserve the VTU data or the VTU itself after receiving Plaintiff's preservation letter. (Dkt. 45-5 at 98:12-99:12). Then Dustar actively removed and destroyed the VTU, the only means of accessing the data from Verizon's long-term archive. (Dkt. 50 ¶ 13.) For these reasons, the Court concludes that Dustar did

17

not take reasonable and affirmative steps to preserve evidence, and as discussed more below, Dustar's actions were willful and with the intent of destroying the discoverable VTU data.

### C. Information that Cannot Be Replaced or Restored

Under Rule 37(e), if ESI *can* be "restored or replaced through additional discovery," then sanctions are inappropriate. Fed. R. Civ. P. 37(e). In other words, if the data exists elsewhere and is retrievable, then "the loss of evidence from one source may often be harmless." Fed. R. Civ. P. 37(e) advisory committee's notes to 2015 amendment; *see also Paisley Park*, 330 F.R.D. at 235 (stating that Rule 37 sanctions are not available when another party had access to the deleted data).

Here, as Plaintiffs point out, the relevant VTU data likely still exists in Verizon's long-term archives. (Dkt. 44 at 17; 45-6 at 27:11–29:11; 75:21-76:20.) However, it is not retrievable for two reasons. First, Verizon cannot effectively search its archive for the relevant VTU data because Dustar opted to self-install the VTU, did not retain the serial number to the VTU, and did not connect Truck 709's VIN or Shawn Munns' name to the VTU in its Verizon account. (Dkt. 45-6 at 26:2-27:7; 62:14-63:4; 75:21-76:16.) Verizon searched using Truck 709's VIN and Shawn Munns' name and only found irrelevant VTU data for a different truck owned by Dustar. (*Id.* at 75:21-76:16; Dkt. 45-12.) Second, Verizon could search its long-term archive using the VTU's serial number, but Dustar has informed the Court that it was unable to find the VTU serial number to enable Verizon's search. (Dkt. 57.) In short, although the relevant VTU data could still exist in Verizon's

archives, it cannot be restored or replaced, because Dustar failed to preserve the VTU or its serial number despite having ample opportunity to do so.

## II.    Intent to Deprive – 37(e)(2)

Having established that (1) Dustar had a duty to preserve, (2) Dustar did not take reasonable steps to preserve, and (3) the ESI cannot be restored or replaced, the Court moves next to sanctions under Rule 37(e)(2).

Whether it be mandatory or permissive, an adverse inference instruction regarding the content of missing ESI is only appropriate when the "party acted with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). That said, "[s]anctions in the form of an adverse inference instruction or entry of default judgment are extreme and should not be given lightly." *N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, at \*16 (citing *Rao v. St. Jude Med. S.C., Inc.*, 631 F. Supp. 3d 678, 712 (D. Minn. 2022)). "Negligent conduct is insufficient to support such severe sanctions." *Kelley*, 657 B.R. at 485 (citing *Auer v. City of Minot*, 896 F.3d 854, 858 (8th Cir. 2018)); *see also* Fed. R. Civ. P. 37 advisory committee's note to 2015 amendment (explaining that "[n]egligent or even grossly negligent behavior does not logically support" an adverse inference instruction)."[T]here must be evidence of 'a serious and specific sort of culpability' regarding the loss of the relevant ESI." *Paisley Park*, 330 F.R.D. at 236 (quoting *Auer*, 896 F.3d at 901). "Intent rarely is proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pacific R.R.*, 373 F.3d 896, 901 (8th Cir. 2004). Other factors may include the timing

of the destruction of the ESI. *See N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, * 23 ("The Court considers the timing of the destruction of the USB devices as one factor when determining intent.").

Plaintiffs contend that Dustar consciously allowed the data to be deleted pursuant to Verizon's automatic deletion policy, despite notice and counsel's commercial trucking litigation expertise. (Dkt. 44 at 21-23.) Plaintiffs also point to Dustar's shifting explanations for the VTU as demonstrating intent to deprive. (*Id.* at 23-24.) And lastly, Plaintiffs asserted at the motion hearing that Dustar's physical removal of the VTU was active spoliation. Dustar argues that its failure to "anticipate a sophisticated telematics-based litigation argument that even" its "counsel did not recognize at that time" amounts to negligence, not intent. (Dkt. 48 at 19.)

The Court notes that the two cases on which Plaintiffs rely for intent to deprive are not cleanly analogous to the circumstances in this case.  First, in *Stevenson v. Union Pacific Railroad Co.*, 354 F.3d 739, 747-48 (8th Cir. 2004), the court addressed the destruction of ESI by a party pursuant to that party's internal retention policy. In *Taylor v. Null*, No. 4:17-CV-0231-SPM, 2019 WL 4673426, at * 23 (E.D. Mo. Sept. 25, 2019), the court similarly addressed the destruction of evidence pursuant to a party's "routine retention policy" allowing ESI be overwritten automatically. Here, Plaintiffs allege that Dustar's conduct is indistinguishable from those cases because Dustar allowed the VTU data to be automatically deleted pursuant to Verizon Reveal's twelve-month retention period. (Dkt. 44 at 22-23.) In other words, Plaintiffs attempt to superimpose a third party's retention policy, Verizon's policy, onto Dustar. Consequently, neither *Stevenson* nor *Taylor* are

20

cleanly on point, because the parties there could have prevented the destruction of ESI pursuant to their own retention policy, whereas here, Dustar did not have its own retention policy. Instead Dustar waited to even seek the ESI from its Verizon Reveal platform until *Verizon's* retention period expired.

This case is more analogous with the circumstances in *Paisley Park*. In considering intent for sanctions under Rule 37(e)(2), the court in *Paisley Park* discussed:

> Were the missing ESI only the result of Wilson and Staley's failure to disengage the auto-delete function on their phones, then the Court might consider the loss of evidence to be the result of mere negligence. But that is not the case here. As noted previously, Wilson and Staley failed not only to turn off the auto-delete function when they anticipated litigation in February 2017, they also wiped and discarded their phones (twice, in Wilson's case) after Plaintiffs filed suit …. This despite the fact that, as evidenced by the fact that Staley backed up photographs from his phone to his cloud storage space and Dropbox, they knew how to preserve information on their phones and knew that information on their phone might be discoverable. The Court finds from these circumstances alone that the RMA Defendants intentionally destroyed evidence.

330 F.R.D. at 236-37. Similarly, here, Dustar knew how to preserve information from its Verizon Reveal platform as Ms. Rens used monthly reports in the course of business and Ms. Koopman testified to using the VTU data to monitor driver's speed among other things. (Dkt. 45-5 at 83:3–85:18; 87:18–88:6; 92:12-15; Dkt. 50 ¶¶ 3, 5.)

Were it simply Dustar's failure to access its Verizon Reveal platform to preserve the VTU data, the Court, like in *Pasiley Park*, might consider the loss VTU data to be the result of mere negligence as Dustar asserts. But Dustar removed and discarded the VTU, the only means of obtaining the data from Verizon's archive, after having received Plaintiffs' preservation letter, after Plaintiff's counsel emailed Dustar's counsel asking if

21

Truck 709 had a telematics device, and after the parties jointly inspected Truck 709. (Dkt. 45-4 at 1-13; Dkt. 55-1.) The timing of this destruction is a factor that demonstrates Dustar's intent to deprive. *N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, * 23.

Additionally, in discovery, Dustar gave shifting explanations regarding what happened to the VTU and its data. First, Dustar claimed the VTU was destroyed in a separate accident on May 9, 2023. (Dkt. 45-8 at 3.) Second, it claimed the VTU was inoperable and replaced following the accident. (Dkt. 45-10 at ¶¶ 4-9.) Dustar also gave shifting explanations regarding the VTU in its briefing and supporting exhibits. In support of Defendant's Memorandum Opposing Sanctions, Ms. Koopman submitted an Affidavit that "Dustar did not remove or disable the Verizon device on the subject truck while the vehicle was in our possession." (Dkt. 51 at 3.) But Ms. Rens submitted an Affidavit that Dustar replaced the VTU in Truck 709 in April 2023. (Dkt. 50 ¶ 13.) At the motion hearing on December 4, 2025, Dustar's counsel acknowledged the affidavits are contradictory and could not explain why. The Court notes these shifting representations demonstrate that Ms. Koopman and Ms. Rens lack credibility. *See Kelley as Tr. of BMO Litig. Tr.*, 657 B.R. at 490 (upholding court's determination that party acted with intent to deprive in part based on inconsistent representations made to the other party and to the court about the destroyed ESI).

Instead of clearly explaining to the Court what happened to the VTU and the VTU's data, Dustar attempts to shift the loss of the VTU data onto Verizon without providing any substantiating documentation. The documents Dustar submitted demonstrate that Dustar contacted Verizon to obtain a replacement VTU, not that the VTU stopped working or

reporting data at the time of the collision.  The Court notes that it gave Dustar an additional opportunity after the hearing to find the VTU or its serial number through other means and Dustar did not do so. (Dkt. 57.) Dustar "cannot not now escape spoliation sanctions by hiding behind" Verizon's retention policy when Dustar had access to its Verizon Reveal platform before the expiration of any data and then removed and destroyed the relevant VTU without noting its serial number. *Evenson*, 2020 WL 12948541, at * 12.

The fact that Dustar checked the reports from Verizon Reveal monthly but did not discover the VTU in Truck 709 allegedly stopped reporting data until years after the collision, combined with Dustar's affirmative removal and destruction of the VTU after receiving Plaintiffs' preservation letter and providing contradicting representations of what happened to the VTU in discovery and to this Court, demonstrate a "serious and specific culpability." *Auer*, 896 F.3d at 901. The Court can only conclude from these circumstances that Dustar acted with the intent to deprive Plaintiffs from using this information.

### A. Appropriate Sanction

"If spoliation is determined, the Court has broad discretion in determining an appropriate sanction and considers the culpability of the party and timing of the actions." *Peterson*, 2021 WL 2686119, at *3 (citing *Dillon v. Nissan Motor Co.*, 986 F.3d 263, 268 (8th Cir. 1993)). However, "Courts should select the least harsh sanction that can provide an adequate remedy." *N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, at * 27 (quoting *Jonathan R. v. Just.*, No. 3:19-CV-00710, 2024 WL 1339522, at *10 (S.D.W. Va. Mar. 28, 2024)); *see also* Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015

amendment ("Courts should exercise caution, however, in using the measures specified in (e)(2).").

Plaintiffs request a mandatory adverse inference instruction directing the jury to presume that the destroyed VTU data would have been unfavorable to Defendants. Under all the facts and circumstances before the Court, the Court agrees that an adverse inference instruction is an appropriate sanction. Because the parties just recently completed expert discovery, the record is not closed, the parties plan to file motions challenging experts, and "the case is still some time from trial," the Court recommends deferring crafting the language of the adverse inference instruction "to a later date, closer to trial." *Paisley Park*, 330 F.R.D. at 237; *see also N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, at * 29 ("At this point, given the NAMSA entities' shifting positions as to the adverse inference instruction and "the fact that discovery is still on-going, the record is not yet closed, and the case is still some time from trial, the Court believes it more appropriate to defer consideration of those sanctions to a later date, closer to trial."); *Monarch Fire Prot. Dist. of St. Louis Cnty.*, *Missouri v. Freedom Consulting & Auditing Servs., Inc.*, 644 F.3d 633, 639 (8th Cir. 2011) ("Here, the district court withheld ruling on Monarch's Rule 37 motion for sanctions until the case proceeded to trial, noting that the appropriate sanction for Indellicati's actions would likely be an adverse inference jury instruction.").

## III.    Prejudice Under 37(e)(1)

This Court, however, will order Dustar to pay monetary sanctions pursuant to Rule 37(e)(1). Sanctions may be awarded under Rule 37(e)(1) "upon finding prejudice to another

party from loss of the information."[12] Fed. R. Civ. P. 37(e)(1) advisory committee's notes to 2015 amendment. "'Prejudice likely exists from lost or destroyed ESI if the lost or missing evidence would be different or more helpful to the party claiming spoliation than the evidence already in existence,' but 'prejudice does not exist when there is no support for the speculation that the lost evidence would have affected the litigation.'" *N. Am. Sci. Assocs., LLC*, 2024 WL 4903753, at * 15 (quoting *FA ND CHEV, LLC v. Kupper*, No. 1:20-CV-138, 2022 WL 16699304, at *3 (D.N.D. Aug. 31, 2022)). The destroyed ESI need not be a "smoking-gun" for a party to be prejudiced, and "[i]n some cases, prejudice can be satisfied by the nature of the evidence itself." *Id.* (citing *Stevenson,* 354 F.3d at 748).

Here, Plaintiffs have been prejudiced by the loss of the VTU data. The data itself is relevant to Plaintiffs negligence claims in two ways. First, since this is a suit about a vehicular collision the lost VTU data may have illustrated Mr. Munns' driving behavior around the time of the collision with Plaintiffs. Second, the lost information regarding Mr. Munns' historic driving behavior during the six-months preceding the collision would have been relevant to Plaintiffs' negligent hiring, retention, and supervision claims. It is unknown what the destroyed VTU data would have shown or how significant that data would be to this litigation. *See Vogt v. MEnD Corr. Care, PLLC*, No. 21-CV-1055 (WMW/TNL), 2023 WL 2414551, at * 11 (D. Minn. Jan. 30, 2023) ) (finding party was prejudiced where destroyed camera footage that may have contained evidence relevant to claim), *R&R adopted sub nom. Vogt as Tr. for Vogt v. MEnD Corr. Care, PLLC*, 2023 WL

---

[12] As discussed above, Rule 37(e)(1) also requires a duty to preserve, failure to take reasonable steps, and irreplaceability—which have already been established.

2414531 (D. Minn. Mar. 8, 2023). Dustar's contention that it may be equally prejudiced by the loss of the VTU data is unconvincing.[13] *See Paisley Park*, 330 F.R.D. at 236 ("The RMA Defendants' claim that no prejudice has occurred is 'wholly unconvincing,' given that 'it is impossible to determine precisely what the destroyed documents contained or how severely the unavailability of these documents might have prejudiced [Plaintiff's]' ability to prove the claims set forth in [their] Complaint.'" *Paisley Park*, 330 F.R.D. at 236 (quoting *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 110 (S.D. Fla. 1987)).

Dustar's other arguments regarding prejudice are similarly unconvincing. First, Dustar relies on cases evaluating sanctions under its inherent authority or Rule 37(b), not prejudice under Rule 37(e)(1). (Dkt. 49 at 17-18 (citing *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 955 (D. Minn. 1999) (discussing Rule 37(b)(2) and the inherent authority to sanction); *Fed. Foam Techs., Inc. v. McGuckin & Pyle, Inc.*, No. 17-CV-0940 (WMW/KMM), 2018 WL 6529499, at * 2 (D. Minn. Oct. 11, 2018) (discussing inherent authority to sanction); *Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, No. 17-CV-5009 (JRT/DTS), 2022 WL 4466071, at * 2 (D. Minn. Sept. 26, 2022) (same).) Second, Dustar's argument that Plaintiff can rely on other liability evidence misses the point that the

---

[13] Dustar argues that the lost VTU data affects both sides equally and is "the type of scenario where courts decline to find prejudice." (Dkt. 48 at 19.) However, Dustar provides only once case where a court found a party was not prejudiced by spoliation. (*Id.* at 19-20 (citing *Fed. Foam Techs., Inc. v. McGuckin & Pyle, Inc*., No. 17-CV-0940 (WMW/KMM), 2018 WL 6529499 (D. Minn. Oct. 11, 2018).) This case does not evaluate sanctions under Rule 37(e)(1) and is distinguishable because the spoliated evidence would not have assisted in determining the cause of the damage or amount of materials at issue in the case, whereas here, the lost VTU data goes directly to the central issue in the case – the cause of the collision. *Fed. Foam Techs., Inc.,* 2018 WL 6529499, at 3.

destruction of the VTU data now forces Plaintiffs "to go to already existing discovery and attempt to piece together what information might have been contained in [the VTU data], thereby increasing their costs and expenses." *Paisley Park*, 330 F.R.D. at 236; *see also Kelley*, 657 B.R. at 492 ("Even if the spoliated evidence is cumulative to some extent, the availability of the same or similar evidence from third parties or other sources does not necessarily demonstrate a lack of prejudice.").

"Rule 37(e)(1) allows the Court to impose any measures necessary to cure the prejudice resulting from spoliation." *Paisley Park*, 330 F.R.D. at 237. The range of sanctions available to the Court is "quite broad" and "[m]uch is left to the court's discretion." *Id.* (quoting Fed. R. Civ. P. 37(e), advisory committee's note to 2015 amendment). Many courts have imposed monetary sanctions under Rule 37(e)(1). *See Spencer v. Lunada Bay Boys*, No. 16-CV-2129, 2018 WL 839862, *1 (C.D. Calif. Feb. 12, 2018) (collecting cases); *Jones*, 2022 WL 4354586, at *5 ("Among the available sanctions for ESI spoliation, a court may order the spoliating party to pay the aggrieved party's attorney's fees and expenses relating to the ESI loss."). Because Plaintiffs have been prejudiced the Court will order Dustar, pursuant to Rule 37(e)(1), to pay Plaintiffs the attorney's fees and costs that Plaintiffs incurred as a result of investigating the spoliation and bringing this Motion for Sanctions before the Court. The Court will *not* grant Plaintiffs other requested curative measures as it finds monetary sanctions under Rule 37(e)(1) sufficient to cure the prejudice.[14]

---

[14] The Court notes that Plaintiffs provided only a conclusory argument for the other curative measures requested. (Dkt. 44 at 29-30.) Moreover, as requested, the curative measures

27

## RECOMMENDATION

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiffs' Motion for Sanctions be **GRANTED IN PART**, to the extent it seeks an adverse inference instruction as a sanction for the spoliation of evidence under Federal Rule of Civil Procedure 37(e)(2); with the language of the adverse inference instruction to be determined at a later date.

2. Plaintiffs' motion be **DENIED** without prejudice in all other respects.

## ORDER

3. Plaintiffs' Motion is **GRANTED** to the extent it seeks attorneys' fees under Rule 37(e)(1).

    a. Within 21 days of the date of this Order, Plaintiffs shall file a submission with the Court detailing all reasonable fees, costs, and expenses they have incurred as a result of bringing this Motion for Sanctions. Within 14 days of that filing, Defendant Dustar may, if it deems necessary, file a memorandum in response.

4. Failure to comply with any provision of this Order or any other prior consistent order shall subject the non-complying party, non-complying counsel and/or the

---

Plaintiffs propose appear to have the "effect of measures that are permitted under subdivision (e)(2)" which Courts are to prevent.  Fed. R. Civ. P. 37(e)(2) advisory committee's notes to 2015 ("An example of an inappropriate (e)(1) measure might be an order striking pleadings related to, or precluding a party from offering any evidence in support of, the central or only claim or defense in the case")

party such counsel represents to any and all appropriate remedies, sanctions and the like, including without limitation: assessment of costs, fines and attorneys' fees and disbursements; waiver of rights to object; exclusion or limitation of witnesses, testimony, exhibits, and other evidence; striking of pleadings; complete or partial dismissal with prejudice; entry of whole or partial default judgment; and/or any other relief that this Court may from time to time deem appropriate.

Dated: March 31, 2026

_s/Shannon G. Elkins_
SHANNON G. ELKINS
United States Magistrate Judge